## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRACKEN DATA, INC. and | ) | |
| SALZMAN GROUP, LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-cv-273 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THOMAS GUEL and ELLIE | ) | |
| PHARMACEUTICALS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about unpaid bills. In 2020, Thomas Guel founded Ellie Pharmaceuticals with the hope of entering the cannabinoid drug therapies market. To get off the ground, Ellie Pharmaceuticals entered into a contract with Bracken Group to develop an initial business plan, investor pitch deck, and website. Separately, Ellie Pharmaceuticals retained Salzman Group to develop a cannabinoid drug therapy.

The high hopes soon returned to earth. Ellie didn't pay all of its bills, despite promising prompt payment. Bracken sent seven invoices totaling $179,464.62, but Ellie paid only $54,729.62. The story wasn't much better for Salzman. That company sent three invoices totaling $60,000, but Ellie paid only $36,000. All told, Ellie owed the two companies almost $150,000.

Things went from bad to worse. Ellie went out of business, and Bracken and Salzman filed suit to collect the debts. The amended complaint includes 10 counts against Ellie and Thomas Guel. Defendants, in turn, moved to dismiss.

For the reasons stated below, the motion is granted in part and denied in part.

**Background**

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In April 2020, Thomas Guel started Ellie Pharmaceuticals, a limited liability company based in Illinois. *See* Am. Cplt., at ¶¶ 5, 11 (Dckt. No. 5). Ellie developed cannabinoid drug therapies. *Id.* at ¶¶ 11–12. Specifically, "Ellie Pharmaceuticals' primary objective was to leverage the synthetic cannabinoid delta-8-tetrahydrocannabinol (Δ8-THC or d8) to develop drug therapies that could be used in clinical settings such as hospitals in, for example, post-operative circumstances." *Id.* at ¶ 12.

As a new company, Ellie reached out for help on the business side and the scientific side of things. Thomas Guel formed a relationship with Dr. Andrew Salzman, who is the principal of Salzman Group and an expert in d8. *Id.* at ¶ 13. Guel asked Dr. Salzman for a quote for developing d8 into a drug therapeutic. *Id.* at ¶ 14. Dr. Salzman submitted his quote in September 2020. *Id.* at ¶ 15.

At that point, Guel approached Bracken Group – a pharmaceutical consultancy company with expertise in advising on drug development – to evaluate Dr. Salzman's quote. *Id.* at ¶ 17. Bracken later expanded its services from that initial evaluation, and agreed to help get Ellie off the ground. *Id.* at ¶ 18.

On October 8, 2020, Ellie and Bracken entered into a contract. Bracken agreed to develop an initial business plan, prepare a pitch deck, and create Ellie's website. *Id.* at ¶¶ 19–21.

2

Bracken completed the business plan and investor pitch deck, delivering them to Guel on November 30, 2020. *Id.* at ¶ 20.

While the business plan was in the works, Ellie laid the groundwork for the medical part of the company by entering into a contract with Dr. Salzman's company, Salzman Group. *Id.* at ¶ 34. On November 19, 2020, Salzman Group and Ellie signed a Statement of Work. *Id.* That same day, Herring Creek Pharmaceuticals (defined to include Salzman Group, its affiliate) and Ellie Pharmaceuticals entered into a Master Services Agreement that required Ellie to compensate Salzman Group for its research and development. *Id.*

Dr. Salzman quickly got to work. He began to develop drug therapies by converting cannabidiol (CBD) into the synthetic compound delta-9-tetrahydrocannabinol (Δ9-THC or d9). *Id.* at ¶ 35. Dr. Salzman kept Ellie in the loop about his progress. He provided updates to Ellie on a regular basis, sharing his progress by sending deliverables about once a week from December 31, 2020 to February 4, 2021. *Id.* at ¶ 36.

The bills soon followed the work. And that's where Ellie ran into trouble. It paid some of the invoices, at least in part. But tens of thousands of dollars went unpaid. Ellie was better at assembling a team than paying them.

Bracken issued Ellie seven invoices totaling $179,464.62 for its work in October, November, and December 2020. *Id.* at ¶ 22. Ellie only paid one invoice. *Id.* at ¶ 23. On November 19, 2020, an Ellie representative wrote and signed a check made out to Bracken for $54,729.62 from an account belonging to Beaker Process Development, LLC, another company organized by Guel. *Id.*

The remaining balance of $124,735 went unpaid. Bracken requested payment several times, without much luck. *Id.* at ¶ 26. In the meantime, interest began to accrue. Under the

contract, "[i]f any invoice is not paid within 30 days of invoice date, then [Bracken Group] will be entitled to charge interest on all amounts outstanding beyond 30 days at a rate of 2% above the current Bank base-lending rate." *Id.* at ¶ 25.

Again and again, Ellie promised to pay its bills, but payment never arrived. In late January 2021, Ellie promised to pay by February 3, 2021. *Id.* at ¶ 28. But that deadline came and went without payment. Ellie then promised to pay by February 12, 2021, but it missed that deadline, too. *Id.* at ¶ 29. Ellie kicked the can down the road, promising to pay by February 22, 2021. *Id.* Once again, Ellie missed the payment. In the end, Ellie never paid, leaving Bracken with a trail of broken promises and an outstanding bill. *Id.* at ¶ 30.

Salzman Group had a similar experience. Salzman issued three invoices to Ellie totaling $60,000 for work performed in November 2020, December 2020, and January 2021. *Id.* at ¶ 37. Guel paid $24,000 to Salzman, but left $36,000 outstanding. *Id.* at ¶ 38.

In January 2021, Dr. Salzman reached out to Guel over WhatsApp about the outstanding bills. *Id.* at ¶¶ 39–40. Guel responded that he was trying to wire the money. *Id.* at ¶ 42. On January 28, 2021, Herring Creek Pharmaceuticals (again, an affiliate of Salzman Group) received a $12,000 wire from Ellie. *Id.*

Salzman Group asked Ellie to send the remaining $24,000, but Ellie never paid up. *Id.* at ¶ 43. Instead, on February 17, 2021, Guel sent Dr. Salzman an email attempting to secure a mutual release of claims. *Id.* at ¶ 44. When Dr. Salzman rejected the proposed release, Guel responded that the remaining bill would go unpaid. And then Ellie went under.

In January 2022, Bracken Data and Salzman Group sued Ellie and Thomas Guel. *See* Cplt. (Dckt. No. 1). They later amended the complaint, bringing ten claims. *See* Am. Cplt. (Dckt. No. 5).

4

Counts I and II are breach of contract claims by Bracken and Salzman against Ellie Pharmaceuticals. Counts III–VIII are unjust enrichment, quantum meruit, and promissory estoppel claims in the alternative by Bracken and Salzman against Ellie. Count IX is a common law fraud claim against both Ellie and Thomas Guel. And Count X is a piercing the corporate veil claim against Guel.

Defendants, in turn, moved to dismiss on a few different grounds. They argue that the Court lacks subject matter jurisdiction over the claims by Salzman Group, given the small amount in controversy. They argue that Plaintiffs lack the capacity to sue. And they contend that two of the counts fail to state a claim. *See* Defs.' Mtn. to Dismiss (Dckt. No. 12).

## Legal Standards

Defendants moved to dismiss for lack of subject matter jurisdiction, and for failure to state a claim. Different standards apply to each type of motion.

Federal courts are courts of limited jurisdiction. *See Harrington v. Berryhill*, 906 F.3d 561, 566 (7th Cir. 2018). "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id.* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000," and is between parties with diverse citizenship. *See* 28 U.S.C. § 1332(a). The relevant time when evaluating jurisdiction is the day when a party invokes federal jurisdiction. The key moment is the moment of arrival in the federal courthouse.

The burden rests on the party who brought the case to federal court, either by filing the case in the first place (as the plaintiff) or by removal (as the defendant). *See Meridian Sec. Ins.*

5

*Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006); *see also Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447 (7th Cir. 2005) ("Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction.").  When a defendant challenges a plaintiff's allegation of the amount in controversy, the plaintiff must support its assertion with competent proof.  *See McMillian v. Sheraton Chicago Hotel & Towers*, 567 F.3d 839, 844 (7th Cir. 2009).  The plaintiff must prove the "jurisdictional facts by a preponderance of the evidence."  *Id.* (quoting *Meridian Sec.*, 441 F.3d at 543).

Dismissal is warranted only if it is a "legal certainty" that the amount in controversy is actually less than $75,000.  *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938) ("The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls [] if the claim is apparently made in good faith.  It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."); *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011) ("[T]he estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible."); *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 579 (7th Cir. 2017) ("If the removing party is able to meet this burden, then remand is appropriate only if the plaintiff can establish the claim is for less than the requisite amount to a legal certainty.").  Simply put, "unless recovery of an amount exceeding the jurisdictional minimum is legally impossible, the case belongs in federal court."  *See Back Doctors*, 637 F.3d at 830.

A motion to dismiss for failure to state a claim challenges the sufficiency of the complaint, not the merits of the case.  *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*,

6

910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

On a motion to dismiss, a complaint typically rises or falls based on the content within the four corners of the complaint. But an exhibit to a complaint is considered part of the complaint itself, so it is fair game on a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); Fed. R. Civ. P. 10(c).

**Analysis**

Defendants move to dismiss on four grounds. They begin by arguing that the Court lacks jurisdiction over Salzman's claims in light of the amount in controversy. Next, they argue that Plaintiffs lack capacity to sue here because they are not registered to do business in this state as required by the Illinois Business Corporation Act. Finally, Defendants argue that the complaint fails to state a claim of piercing the corporate veil (Count X) and a claim of common law fraud (Count IX).

The Court starts with jurisdiction because "[s]ubject-matter jurisdiction is the first issue in any case." *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 902 (7th Cir. 2019). Everything else will follow from there.

7

I.      **The Amount in Controversy**

The first question is whether this Court has subject matter jurisdiction over Salzman's claims.  Defendants point out that Salzman alleges a failure to pay $36,000, far less than the jurisdictional minimum of $75,000.  *See* Defs.' Mtn. to Dismiss, at 3 (Dckt. No. 12).  According to them, Salzman didn't get even halfway there.

Diversity jurisdiction has two requirements.  The first requirement is the amount in controversy.  District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000."  *See* 28 U.S.C. § 1332(a).  The second requirement is the diversity of citizenship.  The suit must involve "citizens of different States," or "citizens of a State and citizens or subject of a foreign state."  *See* 28 U.S.C. § 1332(a)(1), (2).

This case involves complete diversity of citizenship.  Plaintiff Bracken Data is a citizen of Pennsylvania, and Plaintiff Salzman Group is a citizen of Israel.  Defendants are citizens of Illinois.  So there is complete diversity.[1]

The only issue is the amount in controversy.  There is no dispute about Bracken's claims when it comes to the amount in controversy.  Bracken alleges that Ellie didn't pay $124,735, so the claim exceeds the statutory minimum.  *See* Am. Cplt., at ¶ 24 (Dckt. No. 5).  Bracken cleared the amount-in-controversy hurdle, but Salzman has to clear that hurdle, too.

---

[1]  The jurisdictional allegations of the complaint were inadequate, prompting this Court to issue two Orders to clear things up.  *See* 1/24/22 Order (Dckt. No. 4); 2/14/22 Order (Dckt. No. 10).  One Defendant (Ellie) is a limited liability company, and an LLC has the citizenship of its members.  *See Belleville Catering Co. v. Champaign Mkt. Place LLC*, 350 F.3d 691, 692 (7th Cir. 2003); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998).  For jurisdictional purposes, it makes no difference where an LLC is registered, or where it has its principal place of business.  An LLC is treated like a partnership.  A partnership has the citizenship of its partners, and an LLC has the citizenship of its members.  So, they basically have the citizenship of their component parts.  The parties later confirmed (after missing this Court's deadline) that Ellie Pharmaceuticals LLC has only one member (Thomas Guel), and that Guel is an Illinois citizen.  *See* 2/14/22 Order; Joint Initial Status Report, at 2 (Dckt. No. 17).

When it comes to the amount in controversy, one plaintiff cannot bring another plaintiff along for the ride. Plaintiffs cannot aggregate their claims to satisfy the amount in controversy requirement. *See Prolite Bldg. Supply, LLC v. MW Mfts., Inc.*, 891 F.3d 256, 257 (7th Cir. 2018) ("[A]ggregation of different litigants' claims is not allowed."). From a jurisdictional standpoint, each plaintiff must stand on his or her own two feet. So, a district court must look at each plaintiff's claims to see if they independently exceed the $75,000 minimum.

Salzman alleges that Defendants failed to pay $36,000. *See* Am. Cplt., at ¶¶ 38, 56 (Dckt. No. 5). If Salzman sought only $36,000, and nothing else, this Court would lack original jurisdiction over its claims, because $36,000 is far less than $75,000.

In their briefs, the parties quickly pivot to whether this Court has supplemental jurisdiction over the claims by Salzman, given that the Court does have original jurisdiction over the claims by Bracken. *See* 28 U.S.C. § 1367(a). Section 1367(a) "permits the adjudication of a claim by a pendent party that neither arises under federal law nor is supported by diversity of citizenship." *See Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 931 (7th Cir. 1996). Under that section, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the district courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). In other words, "[s]ection 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction." *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).

The parties changed subjects too quickly. Evaluating the existence of supplemental jurisdiction would make sense if Salzman had demanded $36,000, and nothing else. But that's not what the complaint says.

The complaint also includes a demand for punitive damages on the fraud claim. *See* Am. Cplt., at ¶ 96 (Dckt. No. 5). Punitive damages count when calculating the amount in controversy. *See Schutte v. Ciox Health, LLC*, 28 F.4th 850, 855 (7th Cir. 2022). The only exception is when it is a legal certainty that a party cannot recover punitive damages. *Id.* So, unless the demand for punitive damages is dead on arrival, they count.

Salzman demanded punitive damages on the fraud claim, and under Illinois law, a claim of fraud can give rise to punitive damages. *See Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 275 (7th Cir. 2011). The complaint does not give any reason to believe that punitive damages are not recoverable. And nothing in the complaint suggests that it is a legal certainty that the Salzman could not recover at least $39,001 (that is, the delta between $36,000 and $75,001) in punitive damages.

Viewing the complaint as a whole, then, Salzman demands $36,000 in compensatory damages, plus an unspecified amount of punitive damages. It is not a legal certainty that Salzman will recover less than $75,001 on his claims. As a result, Salzman satisfies the amount in controversy requirement.

As an aside, and at risk of spoiling the ending, this Court later dismisses the fraud claim for failure to satisfy the particularity requirements of Rule 9(b). The dismissal of that claim does not undermine whether the complaint satisfies the amount in controversy requirement. Courts do not whittle down a complaint on a motion to dismiss, and then evaluate the amount in controversy of the surviving claims. Jurisdiction is a pre-whittling exercise.

The Court must evaluate the amount in controversy when a complaint arrives in the federal courthouse, before drilling down on each individual claim. *See Clark v. State Farm Mut. Auto. Ins. Co.*, 473 F.3d 708, 711 (7th Cir. 2007) ("The amount in controversy requirement, however, must be determined by the district court at the beginning of the suit, and is not dependent on subsequent dismissal of individual claims used to satisfy the jurisdictional threshold."); *Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004) ("Combining partial decision on the merits with a jurisdictional dismissal violates the norm that courts cannot decide any controversy over which they lack subject-matter jurisdiction. It is the *case,* rather than the *claim,* to which the $75,000 minimum applies. If the complaint as filed puts more than $75,000 at issue, then a district court has jurisdiction and may resolve on the merits every legal theory and aspect of damages. Whether § 1332 supplies subject-matter jurisdiction must be ascertained at the outset; events after the suit begins do not affect the diversity jurisdiction.") (emphasis in original). The fact that a key claim is thrown overboard does not destroy the existence of subject matter jurisdiction.

The Court denies Defendants' motion to dismiss Salzman's claims for lack of subject matter jurisdiction.

## II. Illinois Business Corporation Act

Next, Defendants argue that Bracken and Salzman lack the capacity to sue. They contend that Plaintiffs are out-of-state corporations without a certificate of authority from the Illinois Secretary of State. *See* Defs.' Mtn. to Dismiss, at 2–3 (Dckt. No. 12). In their view, the lack of the certificate means that they have no capacity to sue.

The Illinois Business Corporation Act of 1983 ("IBCA") empowers corporations to "sue and be sued, complain and defend, in its corporate name." *See* 805 ILCS 5/3.10(b). Out-of-state

11

corporations can exercise that power, too. *See* 805 ILCS 5/13.10 ("A foreign corporation which shall have received authority to transact business under this Act shall . . . enjoy the same, but no greater, rights and privileges as a domestic corporation . . . .").

But before transacting business in this state, an out-of-state company needs to register with the state. A "foreign corporation organized for profit, before it transacts business in this State, shall procure authority so [sic] to do from the Secretary of State." *See* 805 ILCS 5/13.05. One of the benefits of registering is access to the judicial system.

Under the Act, an out-of-state corporation cannot file suit in Illinois unless that corporation has registered to do business here. "No foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority." *See* 805 ILCS 5/13.70(a). In other words, a foreign corporation cannot go to court in Illinois without first obtaining a certificate of authority.

Defendants argue that Bracken and Salzman did not register to do business in Illinois. And on that point, there is no dispute. Bracken and Salzman concede that they lack a certificate of authority to do business here. *See* Pls.' Mem., at 5 (Dckt. No. 14). So, as Defendants see it, Bracken and Salzman are out of luck.

On its face, the text of the statute applies to any "court of this State." *See* 805 ILCS 5/13.70(a). At first blush, it might not jump off the page that the statute applies in federal court. After all, a federal court in Illinois is *in* this State, but it is not a "court *of* this State." *See* 805 ILCS 5/13.70(a) (emphasis added). The State of Illinois holds the keys to the doors of the state courthouse, but its power to control access to the federal courthouse is more limited.

The Federal Rules bring state law into play when it comes to capacity to sue. Rule 17(b) governs the capacity to sue. And it does not point to the law of the forum state at all. Instead,

Rule 17(b) provides that the capacity to sue depends on the law of the state of incorporation. "Capacity to sue or be sued is determined as follows: . . . for a corporation, by the law under which it was organized." *See* Fed. R. Civ. P. 17(b)(2).

Bracken Data is a Pennsylvania corporation, and Salzman Group is an Israeli corporation. There is no suggestion that the law of Pennsylvania or Israel would prevent them from suing here. So, if Rule 17(b) gave the last word, Bracken and Salzman would be free to sue here.

But there is another wrinkle. Rule 17(b) applies naturally when a district court exercises federal question jurisdiction – that is, when the claim arises under federal law. In that case, the capacity to sue is governed only by the law of the state of incorporation (unless federal law adds some other limitation, too).

But when a district court exercises diversity jurisdiction, the court must apply the substantive law of the forum state. A federal court sitting in diversity applies state substantive law (as determined by the forum state's choice-of-law rules), and applies federal procedural law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Lash v. Sparta Comm. Hosp. Dist.*, 38 F.4th 540, 542 (7th Cir. 2022).

The question, then, is whether the capacity to sue is substantive or procedural. If it is substantive, and if Illinois choice-of-law rules point to the application of Illinois law, then the Illinois Business Corporation Act comes back into play. In that case, Plaintiffs could not sue here (because they lack a certificate of authority) unless an exception applies. But if the capacity to sue is procedural, then the Court does not have to look to the Illinois statute at all. In that case, the Court could stick with Rule 17(b), which points only to the state of incorporation.

Courts have recognized that the capacity to sue is substantive, not procedural. *See RehabCare Grp. E., Inc. v. Camelot Terrace, Inc.*, 2010 WL 5174369, at *3 (N.D. Ill. 2010) (St.

13

Eve, J.) ("Relevant case law holds that a corporation's capacity to sue is a question of substantive law."); *Coach, Inc. v. Sunstar Video, LLC*, 2013 WL 11325068, at *2 (S.D. Ill. 2013) ("[A] corporation's capacity to sue is a question of substantive law and federal courts sitting in diversity apply state substantive law."); *Camp's Plant, Inc. v. SMG Trucking, LLC*, 2019 WL 3082465, at *3 (W.D. Ark. 2019) ("A corporation's capacity to sue is a question of substantive law, and, therefore, state law would apply to the dispute."); *Sanchez v. Grandview School Dist. No. 200*, 2012 WL 12918718, at *1 n.2 (E.D. Wash. 2012); *Chrysler Credit Corp. v. Superior Dodge, Inc.*, 538 F.2d 616, 618 (4th Cir. 1976) (citing the "well established principle that the issue of a corporation's capacity to sue is a question of substantive law").

The Supreme Court reached that conclusion long ago: "corporations exist for specific purposes, and only by legislative act, so that if the life of the corporation is to continue even only for litigating purposes it is necessary that there should be some statutory authority for the prolongation. The matter is really not procedural or controlled by the rules of the court in which the litigation pends. It concerns the fundamental law of the corporation enacted by the state which brought the corporation into being." *See Oklahoma Nat. Gas Co. v. Oklahoma*, 273 U.S. 257, 259–60 (1927).

So the capacity to sue is substantive, not procedural. As a result, the Illinois Business Corporation Act does, in fact, apply when a district court sits in diversity (and when Illinois choice-of-law rules point to Illinois law). *See RehabCare Grp. E.*, 2010 WL 5174369, at *2 (St. Eve, J.) ("[T]he Act applies to a corporation, lacking a certificate of authorization from the Illinois Secretary of State, that brings an action in federal court that sits in diversity and applies Illinois substantive law."); *Coach*, 2013 WL 11325068, at *2 ("The Court, however, will be applying Illinois substantive law to the claims in which it has supplemental jurisdiction over,

14

thus the IBCA will apply to those claims.  Likewise, Coach Services, Inc., an out-of-state corporation, will not be able to pursue its Illinois state law claims if it lacks the capacity to sue under the IBCA.") (citation omitted); *Se. Guar. Tr. Co. v. Rodman & Renshaw Inc.*, 358 F. Supp. 1001, 1010 (N.D. Ill. 1973) ("We are bound to exclude from the federal courts in diversity cases any foreign corporations doing business here illegally which Illinois chooses to exclude from its courts."); *see also Teal Energy USA, Inc. v. GT, Inc.*, 369 F.3d 873, 881 (5th Cir. 2004) ("[W]hen a local law precludes a party's recovery in state court, that party is likewise barred from pursuing its action in diversity in the federal courts situated in that state . . . ."); *Am. Guar. Ins. Co. v. Asbestos Control, Inc.*, 785 F. Supp. 65, 67 (M.D. Pa. 1992) ("[S]uch [door-closing] statutes operate to limit access to the federal courts in actions based solely on diversity jurisdiction.").

The Illinois Business Corporation Act is an example of a "door-closing" statute that limits the power of out-of-state corporations to file suit.  "In diversity of citizenship cases, the corporate capacity is subject to valid 'door closing' provisions of the forum state.  Such state statutes deny court access to businesses not qualified to do business in the state." *See* 4 James Wm. Moore *et al.*, Moore's Federal Practice § 17.26[1][b] (3d ed. 2021).  A "right which local law creates but which it does not supply with a remedy is no right at all for purposes of enforcement in a federal court in a diversity case," so "where in such cases one is barred from recovery in the state court, he should likewise be barred in the federal court."  *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538 (1949).

"For example, a corporation, chartered in State A with capacity to sue under the law of that state, brings suit in State B federal court invoking diversity of citizenship jurisdiction.  If State B has a statute that denies foreign corporations the right to sue in State B unless they have

qualified to do business in State B, the foreign corporation may not sue in State B's federal court even though it has capacity under Rule 17. Stated another way, such a corporation would have capacity but no enforceable right." *See* 4 James Wm. Moore *et al.*, Moore's Federal Practice § 17.26[1][b] (3d ed. 2021); *see also Camp's Plant*, 2019 WL 3082465, at *3 ("It is also well established that a state's door-closing statute may bar a lawsuit from proceeding in federal court, when the sole basis for federal jurisdiction is diversity of citizenship and the lawsuit is based only on a state-law cause of action.").

That outcome makes sense. A party does not have greater rights to bring state law claims in federal court than in state court. If the doors of the state courthouse are shut to a state law claim, then the doors of the federal courthouse are shut too. *See* 6A Mary Kay Kane, Federal Practice & Procedure § 1561 (3d ed. 2022) ("Plaintiff cannot seek relief in a federal court if the doors of the forum state's courts are closed; the fact that plaintiff would have capacity under Rule 17(b) is not sufficient.").

That result avoids two anomalies. If a different outcome applied, an unregistered out-of-state corporation could bring a state law claim in federal court but not in state court. Also, if the opposite rule governed, there would be an asymmetry between out-of-state corporations and in-state corporations. An unregistered out-of-state corporation could bring a state law claim in federal court, but an unregistered in-state corporation could not bring a state law claim against an in-state defendant anywhere. *See Woods*, 337 U.S. at 538 ("The contrary result would create discriminations against citizens of the State in favor of those authorized to invoke the diversity jurisdiction of the federal courts.").

Rule 17 is part of the equation when it comes to capacity to sue. But it is not the full equation in diversity cases. A foreign corporation lacks capacity to sue under Rule 17 if it would

16

lack capacity to sue under the law of the state of incorporation. And in diversity cases, a second hurdle applies: a foreign corporation lacks capacity to sue if a door-closing statute applies. *See* 6A Mary Kay Kane, Federal Practice & Procedure § 1569 (3d ed. 2022) ("There is no reason why these statutes cannot be given effect in the federal courts under the Erie-York doctrine and avoid a conflict between state law and a federal rule by also requiring Rule 17(b) to be satisfied. Thus a corporation will have capacity if it is entitled to sue according to the law under which it was organized, but it still may be deprived of a federal forum for noncompliance with a corporate registration or other door-closing statute just as if there had been a defect in jurisdiction or venue."). A door-closing statute poses a second hurdle in diversity cases, above and beyond the first hurdle of Rule 17.

That conclusion is not the end of the road, but it is near the finish line. The IBCA includes an exception for corporations that conduct little business in the state. "An exception provides that corporations 'engaged in only occasional and isolated transactions in Illinois,' or that are 'simply conducting interstate commerce,' are 'not required to obtain a certificate of authority.'" *See Am. Assoc. of Motorcycle Inj. Laws., Inc. v. HP3 Law, LLC*, 2021 WL 3054799, at *7 (N.D. Ill. 2021) (quoting *Subway Rests., Inc. v. Riggs*, 297 Ill. App. 3d 284, 231 Ill. Dec. 437, 696 N.E.2d 733, 737 (1998)). "'It is the burden of . . . [D]efendant[s] to prove that [a plaintiff] is doing business within [Illinois] according to the terms of the [IBCA] and thus lacks the capacity to bring [their] state law claims.'" *Id.* (quoting *Vernon Co. v. Trimble*, 23 Ill. App. 3d 240, 318 N.E.2d 666, 667 (1974)); *see also Career Concepts, Inc. v. Synergy, Inc.*, 372 Ill. App. 3d 395, 310 Ill. Dec. 61, 865 N.E.2d 385, 392 (2007).

Defendants do not carry their burden. They offer no response to the notion that Plaintiffs engaged in only occasional and isolated transactions in Illinois. *See* Pls.' Resp., at 5 (Dckt. No. 14) (arguing that Plaintiffs have only occasionally, and not recently, contracted in Illinois).

Even if Guel and Ellie had responded, it would not matter. Now is not the time, and a motion to dismiss is not the place, to drill down on the facts. "A determination of whether transactions are occasional or not, such that the foreign corporation does not need a license, requires a fuller review of the facts than is possible on a Rule 12(b)(6) motion." *See Guevara v. Midland Funding NCC-2 Corp.*, 2008 WL 4865550, at *4 (N.D. Ill. 2008). The issue requires a factual determination, and a factual determination should take place after gathering the facts during discovery.

There is one final wrinkle. All of this analysis assumes that Illinois substantive law applies. That conclusion assumes the answer to an antecedent question. The first question is which state's law applies after applying Illinois choice-of-law rules. That is, the first step is to apply Illinois choice-of-law rules and figure out whether Illinois substantive law applies.

Plaintiffs argue that Illinois law does not apply in light of a choice-of-law provision in each contract. *See* Pls.' Mem., at 4–5 (Dckt. No. 14). The agreement between Bracken and Ellie provides that the agreement "shall be governed by the laws of Pennsylvania." *See* Bracken Agreement, at § 8.0 (Dckt. No. 5-1). In a similar vein, the agreement between Salzman and Ellie provides that Massachusetts law applies. *See* Salzman Agreement, at § 10(iv) (Dckt. No. 5-5).

Illinois courts usually enforce choice-of-law provisions in contracts. *See NewSpin Sports, LLC v. Arrow Elec., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018); *Midwest Grain Prods. of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000); *see also Hofeld v. Nationwide Life Ins. Co.*, 59 Ill. 2d 522, 322 N.E.2d 454, 458 (1975) ("Generally, the law

18

applicable to a contract is that which the parties intended, assuming such an intent. When that intent is expressed, it should be followed."). But not always. "Illinois courts typically enforce a contractual choice-of-law provision unless (1) doing so would violate fundamental public policy, and (2) Illinois has a materially greater interest in the litigation than the other state." *See Patterson v. Respondus, Inc.*, 2022 WL 860946, at *12 (N.D. Ill. 2022).

As a federal court sitting in diversity, this Court must do what a state court would do when it comes to substantive law. "Under Illinois choice-of-law rules, which we apply as a federal court sitting in diversity, a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state." *See Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015).

At that point, the parties come to a screeching halt. The parties do not address whether it would violate Illinois public policy to apply the law of Pennsylvania and Massachusetts, and thus do an end-run around the Illinois Business Corporation Act. The parties also do not explore whether Illinois has a greater interest in this case than the other two states.

For now, the Court assumes that the Illinois Business Corporation Act does not apply, either because of limited business contacts or because of a choice-of-law provision (or maybe both). The Court will revisit choice of law down the road. For now, the key point is that there is no reason to jettison Plaintiffs from the courthouse at this early stage.

The Court denies the motion to dismiss based on the notion that Plaintiffs cannot bring suit under the Illinois Business Corporation Act.

### III.     Piercing the Corporate Veil (Count X)

Next, Defendants challenge the claim about piercing the corporate veil.  According to Defendants, piercing the corporate veil is an equitable remedy, not a cause of action.  *See* Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 12).

Once again, choice of law rears its head.  Defendants rely on Illinois law, and all parties take it for granted that Illinois law governs.  *See* Defs.' Mtn. to Dismiss, at 4–5 (Dckt. No. 12); Pls.' Resp., at 7–9 (Dckt. No. 14); *see also United States v. All Meat & Poultry Prods. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 833 (N.D. Ill. 2007) ("Courts have long held that, under Illinois law, piercing the corporate veil is an equitable remedy, not a cause of action.") (collecting cases).

An attempt to pierce the corporate veil is "governed by the law of the state of incorporation."  *See Stromberg*, 77 F.3d at 933; *see also Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012).  The Court *sua sponte* raised the choice-of-law issue and invited supplemental briefs.  *See* 8/5/22 Order (Dckt. No. 29).  In response, all parties agreed that Delaware law applies.  *See* Defs.' Supplemental Mem., at 1 (Dckt. No. 30); Pls.' Supplemental Mem., at 1 (Dckt. No. 31).

Ellie Pharmaceuticals was formed under Delaware law, so Delaware law applies.  As an aside, the phrase "state of incorporation" is an awkward fit for a limited liability company like Ellie Pharmaceuticals, because an LLC isn't "incorporated" (because it isn't a corporation).  *See Stromberg*, 77 F.3d at 933.  A limited liability company is formed or organized, but isn't incorporated.  But the gist is the same – the question is the state that gave birth to the entity.

Delaware law recognizes a claim for piercing the corporate veil.  *See, e.g.*, *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. 2015) ("To state a 'veil-piercing claim,' the

plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."). Delaware courts frequently analyze whether a complaint states a claim for piercing the corporate veil, which presupposes the existence of a claim in the first place. *Id.*; *see also Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003); *Paul Elton, LLC v. Rommel Del., LLC*, 2020 WL 2203708, at *14 (Del. Ch. 2020).

The question, then, is whether the complaint at hand alleges enough facts to state a plausible claim. *See* Defs.' Reply, at 5 (Dckt. No. 16).

"Delaware public policy disfavors disregarding the separate legal existence of business entities." *See Manichaean Capital, LLC v. Exela Tech., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (citation omitted). "Delaware law rests on the fundamental premise that under ordinary circumstances, one entity will not be held responsible for the actions of another." *See Otto Candies, LLC v, KPMG, LLP*, 2020 WL 4917596, at *9 (Del. Ch. 2020). "Persuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999).

Piercing the corporate veil is a tall order, but not an impossible climb. Delaware courts look to a number of factors when deciding whether to piece the corporate veil, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *See MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *11 (Del. Ch. 2010) (quotation marks and citation omitted).

The decision to pierce the corporate veil does not rest on one single factor, "but rather some combination of them, and 'an overall element of injustice or unfairness.'" *Id.* (quoting *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. 2008)); *see also Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (quotation marks and citation omitted). "Most importantly, 'because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence.'" *See Doberstein*, 2015 WL 6606484, at *4 (quoting *MicroStrategy Inc.*, 2010 WL 5550455, at *11); *see also BASF Corp. v. POSM II Props. P'ship, L.P.*, 2009 WL 522721, at *8 n.50 (Del. Ch. 2009).

Plaintiffs point to a number of facts to support the request to pierce the corporate veil. The complaint alleges that Ellie is inadequately capitalized, commingles funds, and fails to maintain arm's-length relationships among related entities. *See* Am. Cplt., at ¶ 99 (Dckt. No. 5). Bracken's "second invoice was paid by a check written from the account of Beaker Process Development, LLC, another company owned by Guel" that had no independent relationship with Bracken. *Id.* Ellie also fails to observe corporate formalities and maintains nonfunctioning officers because "of the lack of management within Ellie Pharmaceuticals other than individuals provided on a consultancy basis, retained by Guel." *Id.* at ¶ 100.

On top of it all, Plaintiffs allege that it would be unjust to maintain the fiction of a separate corporate existence if it cannot recover from Ellie because Ellie is undercapitalized, "as evidenced by its failure to pay Plaintiffs' invoices." *Id.* at ¶ 103.

Proving a basis for piercing the corporate veil is a difficult challenge. But pleading a claim is not. The Federal Rules merely require notice pleading. And here, the amended complaint gives Defendants enough notice that Plaintiffs want to hold one Defendant responsible for the obligations of the other. Defendants' motion to dismiss Count X is denied.

## IV. Common Law Fraud (Count IX)

Finally, Defendants move to dismiss the common law fraud claim. They argue that the complaint fails to allege fraud with particularity as required by Rule 9(b). *See* Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 12); *see also* Fed. R. Civ. P. 9(b).

To bring a fraud claim, Plaintiffs must allege: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *See Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018) (quoting *Doe v. Dilling*, 228 Ill. 2d 324, 320 Ill. Dec. 807, 888 N.E.2d 24, 35–36 (2008)).

Notice that the existence of a false statement is not enough to give rise to a fraud claim. A complaint must allege that the defendant made the statement knowing that it was false, or believing that it was false. And the complaint must allege that the speaker intended to induce an act by the plaintiff.

The Federal Rules demand specificity, not generality, when it comes to allegations of fraud. "Under Federal Rule of Civil Procedure 9(b), the [plaintiff has] to state with particularity

the circumstances constituting fraud. This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted). The complaint must paint "a sufficiently detailed picture of the alleged scheme." *See AnchorBank*, 649 F.3d at 615; *see also Widner v. Karlin*, 402 Ill. App. 3d 1084, 342 Ill. Dec. 475, 932 N.E.2d 602, 605 (2010) ("'A successful common law fraud complaint must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made.'") (citation omitted).

Plaintiffs do not reach the high bar of pleading with particularity. At most, the complaint alleges that Defendants promised to pay, but didn't. *See* Pls.' Resp., at 9 (Dckt. No. 14). A fraud claim requires more than a broken promise to pay.

Bracken alleges that "[a]t least as early as January 28, 2021, a representative of Ellie Pharmaceuticals, Gerri Ciancanelli, promised Bracken Group that Ellie Pharmaceuticals would pay its outstanding invoices by February 3, 2021." *See* Am. Cplt., at ¶ 27 (Dckt. No. 5). "When February 3 passed without payment, Bracken Group again sought payment from Ellie Pharmaceuticals and Guel promised that the invoices would be paid by February 12, 2021." *Id.* at ¶ 28.

Once again, Ellie didn't pay. "When February 12 passed without payment, Bracken Group again sought its payment and Guel promised that the invoices would be paid by February 22, 2021." *Id.* at ¶ 29. The complaint attaches emails between Bracken and Ellie representatives memorializing Ellie's promises of payment. *See* Emails (Dckt. No. 5-4).

24

The allegations about Salzman Group are the same song, different verse. On January 19, 2021, Guel told Dr. Salzman through WhatsApp that "he was at the bank trying to get the wire cleared, but no payment was made." *See* Am. Cplt., at ¶ 40 (Dckt. No. 5). A few days later, Guel "indicated that the December invoice payment would be going out that day." *Id.* at ¶ 41. But Salzman Group received only half the payment. *Id.* at ¶ 42.

Guel promised to send the rest of the money by February 8, 2021, and then (when that didn't happen) by February 10 or 11. *Id.* at ¶ 43. No payment ever came. *Id.* Guel later sought a release, and refused payment. *Id.* at ¶ 44.

Those allegations state a claim for breach of contract, not common law fraud. To state a claim of fraud, a complaint must allege more than a broken promise to pay. A complaint must allege an intent to deceive, and must do so with particularity. That is, the pleading must come forward with specific facts supporting the notion that Defendants intended to deceive when they promised that payments would soon arrive.

A broken promise isn't enough to give rise to a fraud claim. Otherwise, claims of fraud would be the rule rather than the exception whenever someone doesn't live up to his or her end of the deal. There wouldn't be much daylight between contract and tort. Not every broken promise is trickery, and not every failure to perform is deception. A fraud claim requires more than a breach of contract claim, both as a matter of substance (*i.e.*, the elements) and as a matter of pleading.

The complaint offers no such facts. The pleading does not contain any specific facts showing that Defendants knew or believed that their promises to pay were false. That is, Plaintiffs offered no facts supporting the notion that Defendants promised to pay when they knew or believed that they wouldn't pay. Without specific facts, there is no claim.

At most, the complaint offers the conclusory assertion that Defendants "made these knowingly false representations of material fact with the willful and fraudulent intent to induce reliance on them and, by inducing that reliance, secure Plaintiffs' services." *Id.* at ¶ 93. That's a generic statement, dressed in conclusory garb.

There are no facts supporting an intent to induce reliance, either. The complaint lacks any allegations that Defendants induced Plaintiffs to perform any specific act based on a promise of payment. For example, the complaint doesn't allege anything along the lines of "I'll pay you on Date X if you continue doing Task Y."

The complaint alleges that Guel promised to pay on January 19 and 25, 2021. *Id.* at ¶ 40. The complaint also alleges that Salzman Group transmitted deliverables on January 21 and 28, and on February 4, 2021. *Id.* at ¶ 36. But the complaint stops short of alleging facts supporting the notion that Defendants made those statements with an intent to induce reliance.

The same is true of the allegations about Bracken. The complaint alleges broken promises, but does not allege any concrete facts supporting an intent to induce reliance. *See, e.g.*, *id.* at ¶¶ 27–29.

To allege a fraud claim, a creditor must come forward with more than broken promises to pay. And here, there isn't much else. The motion to dismiss Count IX is granted.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court denies Defendants' motion to dismiss Salzman's claims for lack of subject matter jurisdiction. The Court denies the motion to dismiss based on a lack of capacity under the Illinois Business Corporation Act. The Court denies the motion to dismiss the claim of piercing

the corporate veil (Count X).  The Court grants the motion to dismiss the claim of common law

fraud (Count IX).


Date:  September 1, 2022

 

Steven C. Seeger
United States District Judge